**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division**

---

|  |  |  |
|---|---|---|
| | : | |
| PATRIOT-BSP CITY CENTER II, LLC, *et al.*, | : | C.A. No. 1:10-cv-00890-RMU |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| U.S. BANK NATIONAL ASSOCIATION,  *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER**

Plaintiffs Patriot-BSP City Center II, LLC, Patriot-BSP City Center III, LLC, Patriot-BSP

City Center IV, LLC, Patriot Equities, LP, Erik E. Kolar, Alan S. Werther, Michael C. Kolar,

Timothy E. McKenna and Geoffrey C. Gardner, through undersigned counsel, respectfully

submit this Reply Memorandum in Further Support of their Motion for a Temporary Restraining

Order.

**A.  SUMMARY OF GROUNDS FOR ISSUANCE OF A TRO**

Plaintiffs seek a temporary restraining order ("TRO") to enjoin a June 8, 2010 foreclosure

sale at which defendants intend to sell plaintiffs' valuable and unique real estate, which is listed

on the National Register of Historic Places.  Given the uniqueness of the Property, and the

imminence of the foreclosure sale – to be conducted less than six days after the filing of this

Reply Memorandum – plaintiffs clearly have demonstrated that they will suffer certain, great,

and actual irreparable harm in the absence of a TRO.  Plaintiffs also have more than adequately

demonstrated that they are likely to succeed on the merits of their claims – principally, that any

"defaults" alleged by defendants as justification for the foreclosure sale were directly caused by

defendants' own material breaches of the parties' Loan Agreement, such as refusing to fund construction draws which they had previously approved.  At the very least, plaintiffs have demonstrated the existence of serious legal questions going to the merits of their claims – all that is needed to justify injunctive relief, particularly given the strength of defendants' showing of imminent irreparable harm.  As for the balance of equities, defendants allege that the Property to be sold is worth "far less" than the purported amount of the debt, and proffer in support thereof an "appraisal report," prepared at the behest of defendants' counsel, which is facially incredible and is contradicted by the same appraiser's previous appraisal of the same property, as well as a binding written offer, made on June 1, 2010, from a third party who wishes to purchase the Property for an amount which exceeds the debt by millions of dollars and which is more than 2.3 times the "appraiser's" valuation.  For all of these reasons, as set forth in greater detail in plaintiffs' Motion and below, plaintiffs respectfully request the entry of a TRO enjoining the June 8, 2010 foreclosure sale.

**B.  PROCEDURAL BACKGROUND**

Plaintiffs commenced this action in the Superior Court of the District of Columbia on Monday, May 24, 2010, by filing a Verified Complaint together with the instant motion for a TRO (the "Motion").  Shortly after the action was commenced, the Superior Court ordered the parties to appear before the Judge in Chambers for a hearing on the Motion, which was scheduled for Tuesday, June 1, at 3:30 p.m.  Late in the afternoon on Friday, May 28 – the eve of the long Memorial Day weekend – defendant U.S. Bank, N.A. ("U.S. Bank") served plaintiffs with a notice of removal, removing the action to this Court.  Later that evening, this Court ordered defendants to file their opposition to the Motion by noon on June 1 – an Order with which no defendant other than U.S. Bank complied – and permitted plaintiffs to file this Reply

Memorandum on June 2.  Notably, defendants JP Morgan and Lawyers Title – both of which were served with process and consented in writing to the removal of this action to this Court – have not filed any opposition to the entry of a TRO.

**C.  DEFENDANTS' SUBSTITUTION OF A SUCCESSOR TRUSTEE IS NO OBSTACLE TO THE ENTRY OF A TRO**

The Purchase Money Deed of Trust which purportedly entitles defendants to sell plaintiffs' unique and valuable real property at auction lists a single entity – defendant Lawyers Title Realty Services, Inc. ("Lawyers Title") – as the "Trustee" thereunder.  *See* Deed of Trust (Exhibit B to the Complaint) at 1.  From the date the Deed of Trust was executed in January 2008 until the afternoon of June 1, 2010, no defendant ever notified any of the plaintiffs that Lawyers Title had ceased serving as Trustee.  Indeed, on May 28, U.S. Bank filed a "Consent to and Joinder in Removal" executed by Lawyers Title (a true and correct copy of which is attached hereto as Exhibit A) in which neither U.S. Bank nor Lawyers Title saw fit to notify plaintiffs or the Court that Lawyers Title has purportedly been replaced as Trustee.

Instead, defendants waited until the afternoon of June 1, 2010 to notify plaintiffs, for the first time, that Lawyers Title was purportedly removed as Trustee, and that a successor Trustee was appointed, purportedly on April 15, 2010.  *See* Defendant U.S. Bank's Opposition to the Motion ("U.S. Bank Mem.") at 3-4.  In an apparent attempt at obfuscation and delay, U.S. Bank neither identified the substitute Trustee nor filed with the Court a copy of the instrument which accomplished the purported substitution.  *See id*. at 3-4, 16, and 34 (asserting appointment of substitute Trustee but refusing to identify such Trustee).  Plaintiffs have now obtained a copy of such instrument – a "Deed of Removal of Trustee and Appointment of Successor Trustee," a copy of which is attached hereto as Exhibit B, and have learned that the successor Trustee is one Stuart H. Gary, Esq., of the law firm of Gary & Regenhardt PLLC, Vienna, Virginia.

Notably, despite U.S. Bank's repeated assertion that Mr. Gary was appointed as substitute Trustee on April 15, 2010, the Deed of Removal and Appointment makes plain that such appointment became effective only on May 5, 2010 – the very same day that U.S. Bank gave plaintiffs notice of the intended foreclosure sale. *See* Deed of Removal and Appointment (noting recordation of instrument on May 5, 2010); Deed of Trust (Exhibit B to the Complaint), § 1.16 (permitting appointment of successor Trustee "by a written instrument . . . recorded in" the District of Columbia"); Notice of Foreclosure (Exhibit I to the Complaint) (dated May 5, 2010).

Upon learning of Mr. Gary's purported appointment as substitute Trustee, plaintiffs immediately amended their Complaint to name Mr. Gary as a defendant (in his capacity as substitute Trustee).  A true and correct copy of plaintiffs' Verified First Amended Complaint (the "Amended Complaint") is attached hereto as Exhibit C.  Plaintiffs' counsel also immediately contacted Mr. Gary to determine whether he would accept service of the Amended Complaint. *See* Declaration of Richard S. Julie, Esq. ("Julie Decl."), a true and correct copy of which is attached hereto as Exhibit D, ¶9.  Mr. Gary agreed to accept service of the Amended Complaint, and stated that he had already received copies of the original Complaint, the Motion, and U.S. Bank's Memorandum in Opposition to the Motion. *Id.*, ¶¶10-11.  Mr. Gary – the Trustee who intends to sell plaintiffs' Property on June 8 – also stated that ***he had no objection to the entry of a TRO which would restrain him from conducting such sale***, so long as he is bears no personal liability in connection therewith. *Id.*, ¶12.  Finally, Mr. Gary stated his intention to file a short brief or letter with the Court stating such non-opposition to the entry of a TRO. *Id.*, ¶13.

U.S. Bank asserts that plaintiffs' Motion for a TRO must be denied because it "has been asserted against the *wrong party*" – *i.e.*, Lawyers Title.  U.S. Bank Mem. at 16.  Given defendants' surreptitious substitution of Mr. Gary as Successor Trustee, their argument is too

cute by half; notably, plaintiff's Motion specifically seeks a TRO "enjoining defendants U.S. Bank, National Association, J.P. Morgan Chase Bank, National Association and Lawyers Title Realty Services, Inc. from selling the Property . . . at the scheduled June 8, 2010 foreclosure sale." In any event, U.S. Bank's argument has been rendered moot by the filing of the Amended Complaint which names Mr. Gary as a defendant.

### D. PLAINTIFFS HAVE ESTABLISHED THAT THEY WILL SUFFER CERTAIN, GREAT, AND ACTUAL IRREPARABLE HARM IN THE ABSENCE OF A TRO

As this Court has held,

> The basis for injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674, 244 U.S. App. D.C. 349 (D.C. Cir. 1985) . . . . First, the injury must be both certain and great, actual and not theoretical. [*Id.*] at 674; *see also Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976), *aff'd*, 179 U.S. App. D.C. 22, 548 F.2d 977 (D.C. Cir. 1976) . . . (the party seeking injunctive relief must show that "[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm."). Second, the harm must be irreparable, in that the harm cannot be remedied solely with monetary damages. *Wis. Gas Co.*, 758 F.2d at 674. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Id.*

*Monument Realty LLC v. WMATA*, 540 F. Supp. 2d 66, 74–75 (D.D.C. 2008).

U.S. Bank asserts that a TRO should not be entered because "***other than a request for injunctive relief***, . . . all of the relief sought in Plaintiff's Complaint is entirely economic." U.S. Bank Mem. at 13-14 (emphasis added). U.S. Bank goes on to assert – irrelevantly – that such "economic . . . injuries are not irreparable" and that "equity will not interfere to restrain the breach of a contract." *Id*. at 14.

None of these arguments address – much less refute – the irreparable harm which plaintiffs will suffer in the absence of a TRO. Unless they are enjoined, defendants plan to sell plaintiffs' valuable and unique real estate, the former Hecht Company Warehouse, at a thinly-

advertised auction on June 8, 2010, in the midst of the most severe recession to hit the economy

in general – and the real estate market in particular – in generations.  As alleged in the Verified

Complaint and the Amended Complaint, this Property – the principal asset of plaintiffs Patriot-

BSP City Center II, LLC, Patriot-BSP City Center III, LLC, and Patriot-BSP City Center IV,

LLC (collectively, the "Borrowers") – is a unique and historically significant art deco

"Streamline Moderne" building which is listed on the National Register of Historic Places.  *See*

National Park Service Certification Form, a true and correct copy of which is attached hereto as

Exhibit E (certifying entry of Hecht Company Warehouse on National Register due to its

"innovative Streamline Moderne architecture, early and extensive use of glass block, and

importance to the city's economic heritage"); *see also* plaintiffs' marketing materials for the

Property (attached hereto as Exhibit F) (showing graphic rendition of the Property upon

completion of renovations).

    This Court and the District of Columbia Court of Appeals have long held that "[w]hen

land is the subject matter of the agreement, the legal remedy is assumed to be inadequate, since

each parcel of land is unique."  *Tauber v. Quan*, 938 A.2d 724, 732 (D.C. 2007) (*quoting Flack

v. Laster,* 417 A.2d 393, 400 (D.C. 1980)); *see also Monument Realty,* 540 F. Supp. 2d at 75

(same); *Peterson v. D.C. Lottery & Charitable Control Bd.*, 1994 U.S. Dist. LEXIS 10309, *14

(D.D.C. July 28, 1994) ("It is settled beyond the need for citation . . . that a given piece of

property is considered to be unique, and its loss is always an irreparable injury"); *United Church

of the Med. Ctr. v. Med. Ctr. Comm'n,* 689 F.2d 693, 701 (7th Cir. 1982) (same); *Salmon v. Old

Nat'l Bank*, 2010 U.S. Dist. Lexis 35056, *11 (W.D. Ky. Apr. 9, 2010) (same); *Bennett v. Dunn*,

504 F.Supp. 981, 986 (D.Nev. 1980) ("Property is always unique under the general principles of the law of equity and its possible loss or destruction usually constitutes irreparable harm").[1]

The fact that plaintiffs bring separate claims against the various defendants for breaches of various contracts, violations of the Equal Credit Opportunity Act, and other declaratory and equitable relief is irrelevant to the central issue before the Court on this Motion – irreparable harm.  Plaintiffs will suffer irreparable harm if the foreclosure sale is not enjoined.  This harm is both "certain and great," and is ***imminent***.  As U.S. Bank concedes, it is planning to sell the Property at auction less than six days from now, "on June 8, 2010 at 12:30 p.m."  U.S. Bank Mem. at 12.  The threat of a foreclosure sale of real property is *presumptively* irreparable harm. *See Peterson*, 1994 U.S. Dist. Lexis 10309 at \*14 ("That [plaintiff] will suffer irreparable harm if he is not granted the temporary restraining order is not in doubt. Failure to [enter the TRO] will result in foreclosure of real property . . .  It is settled beyond the need for citation . . . that a given piece of property is considered to be unique, and its loss is always an irreparable injury."); *Monument Realty*, 540 F.Supp.2d at 76 ("Because the Bus Garage is real property that is valued for its uniqueness, the Court concludes that the plaintiffs have established that the harm here cannot be remedied with monetary damages alone, and is thus irreparable").

Moreover, developments which have transpired since the Motion was filed have only reinforced the irreparable nature of the harm which plaintiffs will suffer if the foreclosure sale is not enjoined.  Plaintiffs have been negotiating with a proposed purchaser of the Property (the "Purchaser") who, on June 1, 2010, tendered to plaintiffs a binding, written offer to purchase the Property for an amount that is far in excess of both the principal balance of the Loan and the

---

[1]     *See also Douglas v. Lyles*, 841 A.2d 1, 9 n. 4 (D.C. App. Ct. 2004) (*quoting Coburn v. Heggestad*, 817 A.2d 813, 823 (D.C. 2003), *in turn quoting 1010 Potomac Assoc. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 212 (D.C. 1984)).

amount (approximately $39 million) which defendants contend is owed under the Loan

Documents.  *See* Julie Decl., ¶¶14-16.  Given the present uncertainty surrounding the Property –

including the threat of the imminent foreclosure sale – plaintiffs have not yet accepted the

Purchaser's offer, though they retain the right to do so.  Given defendants' assertion that they may

sell the Property at auction for a pittance, and then seek recourse against the guarantor plaintiffs

for any deficiency, the threatened loss of this opportunity to sell the Property to the Purchaser *for

a profit* constitutes irreparable harm which is more than adequate to justify the entry of a

temporary restraining order.[2]

### E.  PLAINTIFFS HAVE ADEQUATELY ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS SUFFICIENT TO JUSTIFY A TRO

As the Court of Appeals for the D.C. Circuit has long held, a party seeking preliminary

injunctive relief "need not establish an absolute certainty of success: It will ordinarily be enough

that the plaintiff has raised serious legal questions going to the merits, so serious, substantial,

[and] difficult as to make them a fair ground of litigation and thus for more deliberative

investigation."  *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986) (citations

omitted).  Thus, "[t]he likelihood of success on the merits that a movant for injunctive relief must

demonstrate varies with the quality and quantum of harm that it will suffer from the denial of an

injunction."  *United Mine Workers v. Int'l Union, United Mine Workers*, 412 F.2d 165, 168 (D.C.

Cir. 1969).  Under this flexible approach, "a movant need not always establish a high probability

of success on the merits.  Probability of success is inversely proportional to the degree of

irreparable injury evidenced. A stay may be granted with either a high probability of success and

some injury, or *vice versa*."  *Cuomo v. United States NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985);

---

[2]     Moreover, the Purchaser's binding offer to purchase the Property for an amount far in excess of the debt drives a stake through the heart of U.S. Bank's argument that the value of the Property is *far less* than the purported amount of debt.  *See* U.S. Bank Mem. at 36.

*see also Population Inst.*, 797 F.2d at 1078 (applying *Cuomo* standard to motion for injunction

and holding that "[i]njunctive relief may be granted with either a high likelihood of success and

some injury, or *vice versa* "); *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C.

Cir. 1999) (holding that factors underlying preliminary injunction analysis "interrelate on a

sliding scale and must be balanced against each other"); *Mylan Labs., Inc. v. Leavitt*, 495 F.

Supp. 2d 43, 47 (D.D.C. 2007) ("a movant need not always establish a high probability of

success on the merits, as a particularly strong showing of irreparable injury or some other

combination of factors may warrant a stay").

     Given the strong likelihood of imminent irreparable harm demonstrated by plaintiffs – as

set forth above – plaintiffs need only establish the existence of "serious legal questions going to

the merits" to satisfy the "likelihood of success" prerequisite to issuance of a TRO.  *Population*

*Inst.*, 797 F.2d at 1078; *see also Monument Realty,* 540 F. Supp. 2d at 75 ("it will ordinarily be

enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult

and doubtful, as to make them a fair ground for litigation and thus for more deliberative

investigation" (*quoting WMATA v. Holiday Tours, Inc.,* 559 F.2d 841, 841 (D.C. Cir. 1977)).[3]

Plaintiffs have more than amply demonstrated the existence of such "serious questions."

---

[3]    Notably, the Court of Appeals for the Second Circuit, which applies the same "serious questions" standard as the D.C. Circuit, recently held (citing *Davenport*) that this standard remains in effect even after the Supreme Court's recent trilogy of preliminary injunction decisions in *Winter v. NRDC, Inc.*, 129 S. Ct. 365 (2008), *Munaf v. Geren*, 553 U.S. 674 (2008), and *Nken v. Holder*, 129 S. Ct. 1749 (2009).  *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010) ("The Supreme Court's recent opinions in *Munaf, Winter*, and *Nken* have not undermined its approval of the more flexible approach . . .  None of the three cases comments at all, much less negatively, upon the application of a preliminary injunction standard that softens a strict 'likelihood' requirement in cases that warrant it").  Similarly, Chief Judge Walker of the Northern District of California recently held that, even after *Winter*, a preliminary injunction remains appropriate "where irreparable injury is likely and imminent – for example, in the case of imminent foreclosure . . . – and the plaintiff

1.      **Plaintiffs Have Demonstrated Serious Questions Concerning Defend-
ants' Material Breaches of the Loan Agreement – Which Would
Excuse Any "Default" by Plaintiffs and Would Bar a Foreclosure Sale**

Plaintiffs' Motion amply demonstrated that plaintiffs are likely to succeed on the merits

of – and, at the very least, have raised serious questions regarding – defendants' material

breaches of the Loan Agreement and other Loan Documents.  These material breaches pre-date

any purported "defaults" by plaintiffs, and therefore excuse any such "defaults."  *See, e.g.,*

*Rosenthal v. Sonnenschein Nath & Rosenthal, LLP,* 985 A.2d 443, 452 (D.C. App. Ct. 2009) (it

is a "basic principle of contract law" that a party "is excused from performance under a contract

if the other party is in material breach thereof").

In particular, plaintiffs alleged that U.S. Bank and JP Morgan materially breached the

Loan Agreement by refusing to fund plaintiffs' Draw Request No. 11 – that is, by refusing to

loan to plaintiffs the funds which they had agreed to loan.  It is undisputed that:

a.  Plaintiffs submitted Draw Request No. 11 – in the amount of $1,190,714.25 – to U.S.
Bank (as a Lender and Agent) on March 16, 2009 (*see* Exhibit F to the Complaint);'

b.  Draw Request No. 11 included $409,291 for payment to Davis under the Davis
Contract, which U.S. Bank had previously approved (*see id.*);

c.  U.S. Bank unconditionally approved Draw Request No. 11 on March 30, 2009 (*see*
Exhibit G to the Complaint (e-mail from vice president of U.S. Bank stating "I have
approved the draw on my end");

d.  JP Morgan then approved Draw Request No. 11 on the same date (*see* Exhibit N to
U.S. Bank Mem. ("JP Morgan Chase has confirmed that they will release their
portion of the draw"); and

e.  U.S. Bank and JP Morgan ultimately failed to fund Draw Request No. 11 in full (*see*
U.S. Bank Mem. at 18).

---

has demonstrated a serious merits issue but may be unable to determine a likelihood of
success on the merits."  *Sharma v. Provident Funding Assocs., LP*, 2010 U.S. Dist. Lexis
1407, *3 (N.D. Cal. Jan. 8, 2010).

U.S. Bank now seeks to muddy this issue by raising non-existent "defaults" and newly-asserted excuses for defendants' failure to comply their funding obligations under the Loan Agreement.  U.S. Bank asserts that it was entitled to renege on its obligation and agreement to fund Draw Request No. 11 because the Loan was not "in Balance," as purportedly evidenced by plaintiffs' request that funds be reallocated from the over-funded Interest Reserve to cover a purported shortfall in the operating expense reserve.  *See id.*  This argument finds no support in the Loan Agreement, which states that the "Loan is in Balance if all remaining unpaid costs of the Property . . . including the Reserves, do not exceed the amount of the Loan proceeds not yet advanced by the Lenders."  Loan Agreement (Exhibit A to the Complaint), § 3.2.  That is, for purposes of determining whether the Loan is in Balance, the Loan Agreement requires the various Reserves to be *aggregated*.  U.S. Bank's assertion that the Interest Reserve was over-funded and that the operating expense reserve was under-funded – even if proven – does not establish that the Loan was out of Balance, unless the under-funding was greater than the over-funding – which U.S. Bank does not even allege to have been the case.[4]  In any event, U.S. Bank concedes that ***it agreed*** to reallocate the funds among the various Reserves, thus bringing the Loan into Balance as of March 2009 – at which time the Bank nevertheless stopped funding the Loan.  *See* U.S. Bank Mem. at 18.

As set forth in the Motion, U.S. Bank's and JP Morgan's unjustified and unlawful refusal to disburse any Loan funds from and after April 2009 – their material breach of their Agreement to loan such funds – resulted in a cascade of purported "defaults" by plaintiffs which the banks have now used to justify their attempt to steal the Property through an unlawful foreclosure sale.

---

[4]     Notably, Section 3.2 of the Loan Agreement requires U.S. Bank, if it determines that any Reserve is insufficiently funded, to give notice to plaintiffs, who then have three days to cure any such deficiency.  U.S. Bank does not even allege that it complied with this requirement of the Loan Agreement – because it did not.

The purpose of the Loan was to provide plaintiffs with the funds necessary to redevelop the Property and make it suitable for leasing or sale to third parties.  *See* Loan Agreement, § 1.1 ("Lender . . . agrees to lend to Borrower . . . the proceeds of the Loan . . . for the purpose of refinancing the acquisition costs of the Property, leasing the Improvements, performing the Renovations, paying interest on the Loan, and otherwise paying the approved costs set forth in the Sworn Construction Cost Statement").  Specifically, the Loan Agreement provides that:

    a.  Interest on the Loan shall be paid from the proceeds of the Loan (*id.*, § 3.1, Fourth Paragraph);

    b.  Construction costs shall be paid from the proceeds of the Loan (*id.*, § 3.6(c));

    c.  Real estate taxes shall be paid from the proceeds of the Loan (*id.*, § 3.6(h)); and

    d.  Other indirect (non-construction) items (including, without limitation, utility bills) shall be paid from the proceeds of the Loan (*id.*).

U.S. Bank asserts that plaintiffs defaulted under the Loan Agreement – purportedly entitling defendants to sell the Property at the impending foreclosure sale – by failing to pay interest on the Loan, failing to pay real estate taxes, failing to pay construction costs, and failing to make certain "swap payments."  U.S. Bank Mem. at 8-9.  But each and every one of these payments which plaintiffs were purportedly required to make and purportedly failed to make ***were to be paid from the Loan proceeds which defendants unilaterally and unlawfully refused to disburse***.  Both at law and in equity, the Lenders may not be heard to complain of "defaults" by plaintiffs which were caused *in toto* by the Lenders' own defaults under the Loan Agreement.[5] At the very least, these constitute "serious legal questions going to the merits" sufficient to

---

[5]    For the same reason, U.S. Bank's assertion that plaintiffs "defaulted" by suffering the imposition of mechanics' liens on the Property (U.S. Bank Mem. at 11) is belied by the fact that such liens were imposed because ***U.S. Bank breached its obligation to fund payments to the general contractor and sub-contractors under construction contracts which U.S. Bank had approved in advance.***

justify a TRO to maintain the status quo pending a full hearing on the parties' competing claims and allegations.

Similarly, U.S. Bank asserts that plaintiffs defaulted under the Loan Agreement by failing to meet a Leasing Hurdle, which required that a certain percentage of the Property be leased to third parties by a certain date.[6] But U.S. Bank concedes that the Property "needs approximately $200,000 in repairs to complete renovations *so that it can be leased*." U.S. Bank Mem. at 11 (emphasis added). That is, U.S. Bank asserts that certain construction work needs to be done at the Property to render it suitable for leasing; concedes that the Loan Agreement provides (at § 3.6(c)) that such construction costs were to be paid from the Loan proceeds; concedes that U.S. Bank and JP Morgan have refused to disburse the Loan Proceeds; and argues that *the Borrower*

---

[6]    U.S. Bank repeatedly asserts that plaintiffs have "acknowledged" their purported "default" with respect to the Leasing Hurdle. *See, e.g.,* U.S. Bank Mem. at 3, 7, 20, & 34. Its sole support for this allegation is a settlement communication letter (Exhibit O to the U.S. Bank Mem.) which explicitly stipulates, at paragraph 6, as follows:

> Inadmissible Evidence.  All evidence of conduct and communications of any nature whatsoever (whether verbal or nonverbal, or express or implied) of any party in connection with the discussions contemplated by this agreement or in any meetings or correspondence relating to a possible modification of the Loan shall be inadmissible for any purpose whatsoever in any judicial or similar proceeding.  The foregoing sentence is intended to be broader than the restrictions on admissibility contained in Rule 408 of the Federal Rules of Evidence and District of Columbia law.

U.S. Bank's filing and repeated reliance on this document, which it agreed would be "inadmissible for any purpose whatsoever in any judicial or similar proceeding," is a gross breach of its obligations stated therein.  The Court should lend no credence to U.S. Bank's assertion that plaintiffs "acknowledged" any Leasing Hurdle "default."  While plaintiffs do concede that the Leasing Hurdle has not been satisfied, such failure is attributable entirely to defendants' breaches of the Loan Agreement, and thus is not a "default" by plaintiffs.

therefore has somehow breached its obligation to lease the premises.[7]  Though U.S. Bank's position is obviously without merit, at the very least, these dueling allegations demonstrate "serious legal questions going to the merits" sufficient to justify the imposition of a TRO.

There can be no legitimate, principled dispute over the fact that the defendant Lenders breached their obligations under the Loan Documents by failing to fund the construction draw that they had already approved.[8]  Of course, the failure to fund the draw had the predictable domino effect.  Contractors went unpaid, and ultimately filed liens and then lawsuits.  Taxes went unpaid.  Utilities went unpaid and, importantly for purposes of this Motion, leasing prospects came to a grinding halt.

While U.S. Bank makes much of the fact that the Borrowers were unable to achieve the April 2009 Leasing Hurdle, the undisputed fact is that defendants ***never*** declared a default on that basis until October 2009.  *See* U.S. Bank Mem. at 9 (describing October 21, 2009 "Notice to Cure").  By that time, following seven months of the Lenders' refusal to fund any monies under

---

[7]     U.S. Bank's assertion that it was not obligated to fund "tenant improvements" at the Property (U.S. Bank Mem. at 19) is simply a red herring, given that (a) plaintiffs have made no claims with respect to tenant improvements and (b) plaintiffs never submitted any draw requests to the Lenders for any funding for tenant improvements.  The Davis Contract, which U.S. Bank approved and then refused to fund, was for general construction and repairs ("Renovation work" under § 3.6(c) of the Loan Agreement), not for Tenant Improvements under § 3.8 of the Loan Agreement.

[8]     U.S. Bank's argument that it was not obligated to fund the draw because the Loan was not "in Balance" is belied by the factual history and, indeed, by the documents that U.S. Bank has submitted in opposition to plaintiffs' Motion.  Thus, while it is true that, according to the banks' calculations, the Loan was not "in Balance" as of March 23, 2009 (*see* Exhibit 1.M to U.S. Bank Mem.), plaintiffs had over-funded the interest reserve, and had requested that such over-funding be transferred to fund the draw request.  *See* Exhibit L to U.S. Bank Mem.  U.S. Bank *agreed* to do so.  *See* U.S. Bank Mem. at 18.  Thereafter on March 30, 2009, the defendant Lenders expressly agreed to fund the draw, which they had approved weeks earlier.

the Loan Agreement, defendants had succeeded in creating a default and rendering it virtually impossible for plaintiffs to meet the Leasing Hurdle.[9]

Defendants ignore the "cure rights" that the parties had negotiated.  First, the Loan Agreement provides that a failure by the Borrower to achieve the Leasing Hurdle would only constitute an event of default "*within twenty (20) days after receipt of written notice that such obligation was not performed*."  Loan Agreement, § 6.1(c).  In this case, it is undisputed that no written notice of default relative to the Leasing Hurdle was sent on April 10, 2009 or within any reasonable time thereafter.  If a notice had been served on April 10, 2009, the Loan Agreement further states that "if cure cannot reasonably be effected within such twenty (20) day period, *such failure shall not be an event of default* hereunder so long as Borrower promptly (and in any event, within ten (10) days after receipt of such notice) *commences cure*, and thereafter diligently (in any event, within forty five (45) days after receipt of such notice) prosecutes such cure to completion."  *Id*. (emphasis added).

Under such circumstances, U.S. Bank's reliance upon the Leasing Hurdle provision is curious at best.  No default was declared for failure to meet the Leasing Hurdle in April 2009.  Had such a default been declared, defendants would have been entitled to liberal cure opportunities.  However, the cure necessarily would have entailed the Lenders' living up to their obligations under the Loan Documents, including *funding the construction draws that they had already approved*.  By failing to do so, defendants sounded the death knell, resulting in unpaid

---

[9]     Indeed, contrary to defendants' unsubstantiated contentions, plaintiffs had substantial, viable leasing prospects.  Indeed, the Architect of the Capitol had submitted an RFP and ultimately had negotiated a lease for approximately 90,000 square feet at the Project.  Although it was fully negotiated and ready to be signed, approval of that lease needed to wend its way through a separate approval process at the GSA – which ultimately broke down when defendants brought the renovations to a halt by unlawfully cutting off funding.

contractors, taxes, utilities and most importantly for purposes of this motion, the elimination of

leasing opportunities.  Plainly, defendants are estopped from relying on the Leasing Hurdle as a

default; indeed, having created the conditions they complain of, defendants are estopped from

asserting any default at all.

> **2.     Plaintiffs Have Demonstrated Serious Questions Concerning**
> **Defendants' Tortious Conversion of $10 Million of Plaintiffs' Funds**

Plaintiffs have asserted a claim against U.S. Bank and JP Morgan for tortious conversion

of $10 million held by U.S. Bank in a "Blocked Account" and under a Letter of Credit (the

"LOC").  U.S. Bank asserts that plaintiffs are unlikely to succeed on the merits of this claim

because (a) the Blocked Account (accounting for $8 million of the converted funds) is owned by

Buchanan (a non-party which owns 86% of the membership interests in the three plaintiff LLCs);

(b) defendants were entitled to seize the $10 million due to plaintiffs' purported defaults; and (c)

a bank that wrongfully seizes money held in a depositor's account can be held liable only for

breach of contract, not for the tort of conversion.  *See* U.S. Bank Mem. at 21-26.

None of these arguments has any merit.  Addressing them in reverse order, the law is

clear that a defendant is liable for tortious conversion where it "unlawful[ly] exercise[s]

ownership, dominion or control over the personal property of another in denial or repudiation of

his rights thereto.' " *Cuneo Law Group, P.C. v. Joseph*, 669 F. Supp. 2d 99, 123 (D.D.C. 2009)

(*quoting Duggan v. Keto*, 554 A.2d 1126, 1137 (D.C. 1989)).  This Court and the D.C. Circuit

have upheld conversion claims brought by depositors who alleged wrongful seizure of deposited

funds by banks.  *See, e.g., Muir v. Navy Fed. Credit Union,* 529 F.3d 1100, 1111 (D.C. Cir.

2008) (affirming summary judgment in favor of depositor on his conversion claim against Bank

which wrongfully set off funds held in deposit account).

U.S. Bank's second argument – that it was entitled to seize the $10 million in funds from the Blocked Account and the LOC due to plaintiffs' purported "defaults" under the Loan Agreement – must be rejected, at least at this stage, for the reasons set forth above.  Each and every purported "default" by plaintiffs was directly and proximately caused by the defendant Lenders' own defaults on their obligations to fund the Loan.  As set forth at length above, plaintiffs have, at the very least, more than adequately demonstrated "serious legal questions going to the merits" of the default issue sufficient to justify the imposition of a TRO.

Finally, U.S. Bank asserts that plaintiffs' conversion claim is unlikely to succeed because plaintiffs purportedly "do not have any viable claim relating to monies in the Blocked Account," which were deposited in such account by Buchanan.  *See* U.S. Bank Mem. at 22.[10]  This argument is belied by the very Loan Documents which plaintiffs are alleged to have breached.

The Blocked Account was created pursuant to Section 5 of the Modification Agreement (Exhibit 1.G to the U.S. Bank Mem.), which provides that "*Borrower*" – *i.e.*, *plaintiffs* Patriot-BSP City Center II, LLC, Patriot-BSP City Center III, LLC, and Patriot-BSP City Center IV, LLC – "shall deposit, or cause to be deposited, $8,000,000 . . . into one or more U.S. Bank controlled blocked bank accounts held by [U.S. Bank] on behalf of the Lenders."  It further provides that "*Borrower* hereby grants to [U.S. Bank] a first priority security interest in . . . [the] Blocked Account."  Modification Agreement, § 5.  Finally, it provides that "Amounts held by [U.S. Bank] in any Blocked Account . . . shall be credited towards the satisfaction of the Patriot and Principals Guarantors' Liquidity requirement set forth in the Patriot and Principals' Guaranty. . . . Additionally, amounts . . . applied by [U.S. Bank] out of the Blocked Account toward amounts owing under the Loan . . . shall be credited against the maximum principal amount

---

[10]     Notably, this argument does not apply to plaintiffs' $2 million Letter of Credit, which the defendant Lenders unlawfully liquidated.

guaranteed under the Patriot and Principals Repayment Guaranty."  *Id*., § 8.  The "Patriot and

Principals Guarantors" are plaintiffs Patriot Equities, LP, Erik E. Kolar, Alan S. Werther,

Michael C. Kolar, Timothy E. McKenna and Geoffrey C. Gardner.  The "Patriot and Principals

Repayment Guaranty" is the document identified in the Complaint as the "Patriot Guaranty,"

which is attached to the Complaint as Exhibit C.   Regardless of who owns formal title to the

Blocked Account, the Modification Agreement makes plain that *beneficiaries* of the Blocked

Account are the *plaintiffs* in this action.

### 3.    Plaintiffs Have Demonstrated Serious Questions Concerning Defendants' Violations of the Equal Credit Opportunity Act

With respect to plaintiffs' claim for violations of the Equal Credit Opportunity Act, 15

U.S.C. § 1691 *et seq.* ("ECOA"), U.S. Bank concedes that plaintiffs' claim is timely (U.S. Bank

Mem. at 32, n.6) and that both Washington Mutual Bank (now JP Morgan) and U.S. Bank itself

demanded that the plaintiff guarantors obtain guarantees from their respective spouses in

connection with the Loan Agreement and the syndication thereof.  *See id.* at 32 ("U.S. Bank

requested the spousal guarantee"); *id*. at 31 ("Washington Mutual . . . provided Plaintiffs again

with the choice to either have their spouses sign off on the guarantees or provide additional

collateral").   Under ECOA, a lender may require a co-signer or co-guarantor where the principal

borrower or guarantor is not sufficiently credit-worthy.  Despite U.S. Bank's protestations to the

contrary, however, it is crystal-clear that a lender violates ECOA when it demands that a

borrower's or guarantor's *spouse* – as opposed to any other credit-worthy person or entity – co-

sign a loan or guaranty.

U.S. Bank concedes that it demanded ***spousal*** guarantees, and asserts that such conduct

was lawful, despite the fact that U.S. Bank has made these same arguments  – ***unsuccessfully*** –

in prior litigation.  *See Boyd v. **U.S. Bank, N.A.***, 2007 U.S. Dist. Lexis 72455, *16 (D. Kans.

Sept. 26, 2007) ("When an individual applicant fails to meet the creditor's standards 'the creditor may require a cosigner, guarantor, endorser, or similar party – but ***cannot require that it be the spouse***" (emphasis in original) (*quoting* Official Comment to 12 C.F.R. § 202.7(d), 68 Fed. Reg. 13,144)).  Indeed, just days ago, the Iowa Supreme Court reaffirmed this black-letter law, holding that "section 202.7(d) bars a creditor from requiring the signature of a guarantor's spouse." *Bank of the West v. Kline*, 2010 Iowa Sup. Lexis 43, *12 (Iowa May 14, 2010).

ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of . . . marital status . . . or . . . because the applicant has in good faith exercised any right under this chapter." 15 U.S.C. § 1691(a).  Under the Federal Reserve System Board of Governors' Regulation B, 12 C.F.R. Part 202, a guarantor is considered an "applicant," and requiring a spousal guarantee constitutes "discrimination on the basis of marital status." *See, e.g., Boyd*; *Bank of the West*; *FDIC v. Medmark, Inc.*, 897 F.Supp. 511 (D. Kans. 1995).  Defendants in this action admit that they demanded spousal guarantees from the Guarantor Plaintiffs.  *See* U.S. Bank Mem. at 31-32. They concede that such Guarantors refused to provide spousal guarantees – *i.e.*, that such Guarantors "exercised [their] right[s] under" ECOA.  *See id*. at 29-30.  And they concede that they provided plaintiffs with a Hobson's Choice – "either to have their spouses sign off on the guarantees or provide additional collateral.  Again, the decision was entirely Plaintiffs' to make – they had every right to walk away and not agree to the syndication." *Id*. at 31.  That is, defendants concede that they gave plaintiffs the option of (a) agreeing to an ECOA violation; (b) torpedoing the syndication, which would have required plaintiffs to pay $18 million in cash within ten days; or (c) posting $10 million of additional collateral.  This "choice" was no choice at all – it was a penalty for plaintiffs' good-faith exercise of their rights under ECOA.  Plaintiffs

have more than adequately demonstrated serious questions going to the merits of their ECOA claim sufficient to justify a TRO.

**F.   THE BALANCE OF EQUITIES FAVORS PLAINTIFFS**

Plaintiffs asserted in their Motion that the balance of equities favors plaintiffs, given that they stand to lose their Property at a thinly-advertised foreclosure sale where the successful bidder will most likely be defendant U.S. Bank, and that defendants, by contrast, are attempting to collect a debt secured by the Property after declaring "defaults" which were caused by defendants themselves.

In response, U.S. Bank unsurprisingly asserts that the balance of equities favors denial of plaintiffs' Motion because "[t]he present fair market value of the . . . Property, which constitutes U.S. Bank's security interest for its Loan, is worth [*sic*] far less than the amount owed by Defendants."  U.S. Bank Mem. at 36.  This amount, U.S. Bank contends, is approximately $39 million (the "Purported Balance").  *See id.* at 1.

Plaintiffs' Complaint referenced (but did not attach) an appraisal report, prepared on U.S. Bank's behalf, opining that the Property had an "as is" value, as of October 8, 2007, of approximately $87,000,000.  A true and correct copy of this Report (the "October 2007 Appraisal") is attached hereto as Exhibit I.  U.S. Bank now asserts that this same Property which was worth $87 million in October 2007 "is worth far less than" $39 million today.  U.S. Bank Mem. at 36.  In support of this assertion, U.S. Bank has filed a new appraisal report (the "March 2010 Appraisal") under seal.  This March 2010 Appraisal, according to its cover page, was "Prepared For: Mr. Edward F. Schiff, Esq." of the Sheppard Mullin law firm – U.S. Bank's counsel in this action and related litigation concerning the Property and the Loan.  That is, the March 2010 Appraisal was prepared at counsel's behest for purposes of litigation; it is not a business record created in the ordinary course of business.

Remarkably, the March 2010 Appraisal – opining that the Property is now worth "far less than" $39 million – was prepared by ***the same appraiser*** who opined in October 2007 that the Property had an "as is" value of $87 million.  This precipitous decline in value, according to U.S. Bank's hired gun, is "due to declining market conditions and the impact of the ongoing global financial crisis."  *See* March 2010 Appraisal at 2.

This assertion is belied by the most basic recollection of news headlines from the past few years.  By October 2007 (the date of the $87 million appraisal) and January 2008 (when the Loan closed), the "global financial crisis" was already in full swing.  Indeed, on October 15, 2007 – merely one week after the $87 million appraisal was prepared – Federal Reserve Chairman Benjamin Bernanke gave a speech at the Economic Club of New York, titled "The Recent Financial Turmoil and its Economic and Policy Consequences," noting:

> The past several months have been an eventful period for the U.S. economy. In financial markets, sharpened concerns about credit quality induced a retrenchment by investors, leading in some cases to significant deterioration in market functioning. . . .  [C]redit became harder to obtain and, for those who could obtain it, more costly. Tightening credit conditions . . . threatened to intensify the ongoing correction in the housing market and to restrain economic growth.  . . .  [S]ince early this year, investors have become increasingly concerned about the credit quality of mortgages, especially subprime mortgages.  The rate of serious delinquencies has risen notably for subprime mortgages with adjustable rates, reaching nearly 16 percent in August, roughly triple the recent low in mid-2005. . . .
>
> The problems in the mortgage-related sector reverberated throughout the financial system and particularly in the market for asset-backed commercial paper (ABCP). In this market, various institutions have established special-purpose vehicles to issue commercial paper to help fund a variety of assets, including some private-label mortgage-backed securities, mortgages warehoused for securitization, and other long-maturity assets. Investors had typically viewed the commercial paper backed by these assets as quite safe and liquid, because of the quality of the collateral and because the paper is often supported by banks' commitments to provide lines of credit or to assume some credit risk. But the

concerns about mortgage-backed securities and structured credit products (even those unrelated to mortgages) greatly reduced the willingness of investors to roll over ABCP, particularly at maturities of more than a few days.  The problems intensified in the second week of August after the announcement by a large overseas bank that it could not value the ABCP held by some of its money funds and was, as a result, suspending redemptions from those funds. Some commercial paper issuers invoked their right to extend the maturity of their paper, and a few issuers defaulted. In response to the heightening of perceived risks, investors fled to the safety and liquidity of Treasury bills, sparking a plunge in bill rates and a sharp widening in spreads on ABCP.

The retreat by investors from structured investment products also affected business finance. In particular, issuance of collateralized loan obligations (CLOs) and collateralized debt obligations (CDOs), which in turn had been major buyers of leveraged syndicated loans, fell off significantly during the summer. Demand for leveraged loans slowed sharply, reducing credit access for private equity firms and other borrowers seeking to finance leveraged buyouts (LBOs).[11]

Chairman Bernanke was not alone in late 2007 in noting the ongoing economic crisis.  By June 2007, Bear Stearns was notoriously in deep financial trouble, resulting from severe declines in the value of billions of dollars worth of collateralized debt obligations it held.[12]  The collapse of Bear Stearns' hedge funds "sent[] shudders through Wall Street."[13]  On March 14, 2008 – mere weeks after the Loan closed – the Federal Reserve Bank of New York agreed to provide Bear Stearns with a $25 billion bailout loan.  Two days later, Bear Stearns agreed to be acquired by defendant JP Morgan for two dollars per share – a 99% discount to its trading price a year

---

[11]   *See* Bernanke Remarks, *available at*
       http://www.federalreserve.gov/newsevents/speech/bernanke20071015a.htm

[12]   *See* Julie Creswell, *$3.2 Billion Move by Bear Stearns to Rescue Fund*, N.Y. TIMES, June
       23, 2007 (*available at* http://www.nytimes.com/2007/06/23/business/23bond.html).

[13]   *See* Mark Pittman, *Bear Stearns Fund Collapse Sends Shock Through CDOs*,
       BLOOMBERG, June 21, 2007 (*available at* http://tinyurl.com/BloombergBearStearns).

earlier.[14]  Meanwhile, Fannie Mae and Freddie Mac were deep in crisis beginning in the summer of 2007.[15]

In short, the global economic crisis was well underway and well-publicized by October 2007, when the appraiser opined that plaintiffs' Property had an "as is" value of $87 million.  The same appraiser now asserts that the same Property is now worth "far less than" $39 million due to the "impact of the ongoing global financial crisis."  March 2010 Appraisal at 2.  Plaintiffs submit that a credibility crisis – or an intellectual honesty crisis – is the more likely cause of the discrepancy between the appraiser's two reports.  In any event, the appraiser's conclusion as to the Property's value is belied by the fact that a ready, willing, and able Purchaser has now offered to purchase the Property for an amount which exceeds the Purported Balance by *millions of dollars*, and which is more than 2.3 times the purported "current market value" stated by the "appraiser" in his March 2010 Appraisal. *See* Julie Decl., ¶¶14-15.

## G.  THE PUBLIC INTEREST WOULD BE SERVED BY A TRO

Plaintiffs asserted in their Motion that the public interest will be served by entry of a TRO preventing the foreclosure sale because such a TRO would help to promote economic development in the District of Columbia by allowing for completion of the renovation project and return of the landmark Property to viable commercial status.  In response, U.S. Bank argues that the public interest would not be served by "permitting the continuing deterioration of a highly visible and well-known warehouse property in the District of Columbia."  U.S. Bank Mem. at 38.  But there is no indication that any such "deterioration" has occurred (or would continue) absent a foreclosure sale.  U.S. Bank concedes that the Property will be suitable for

---

[14]    *See* Matthew Goldstein, *JPMorgan Buys Bear on the Cheap*, BUSINESS WEEK, March 16, 2008 (*available at* http://tinyurl.com/BWBearStearns).

[15]    *See, e.g.*, *In re Fannie Mae 2008 Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶95,530, 2009 U.S. Dist. Lexis 109886 (S.D.N.Y. 2009).

leasing following only $200,000 of additional repairs – out of a total original construction budget of nearly $7 million on a $66.6 million Loan.  U.S. Bank Mem. at 11.  There is no reason for the Court to suppose that the Lenders – whose Loan is secured by the Property – will continue refusing to fund this relatively minor amount ($200,000) which, U.S. Bank asserts, is necessary to protect the Property (the Lenders' security) and mitigate the Lenders' purported damages.

In the absence of a TRO, on the other hand, the Property will be seized from plaintiffs – experienced real estate developers who have sunk tens of millions of dollars of their own equity into the project – and sold at a thinly-advertised auction, most likely to U.S. Bank itself.  It is difficult to see how the population of the District of Columbia would be served by the presence of yet another vacant, foreclosed industrial property, owned by an out-of-town Bank which will not develop the Property.

## H.  <u>CONCLUSION</u>

For all of the foregoing reasons, as well as those set forth in the Motion and the Amended Complaint, plaintiffs Patriot-BSP City Center II, LLC, Patriot-BSP City Center III, LLC, Patriot-BSP City Center IV, LLC, Patriot Equities, LP, Erik E. Kolar, Alan S. Werther, Michael C. Kolar, Timothy E. McKenna and Geoffrey C. Gardner respectfully request that their Motion for a Temporary Restraining Order be granted and that defendants be restrained from selling the Property located at 1401-1403 New York Avenue, N.E., Washington, D.C. at the scheduled June 8, 2010 foreclosure sale.

## REQUEST FOR HEARING

Pursuant to Local Civil Rule 7(f), plaintiffs hereby request an oral hearing with respect to their Motion.

Respectfully submitted,

**KASS, MITEK & KASS, PLLC**


BY:  /s/ Benny L. Kass
Benny L. Kass (D.C. Bar No. 025155)
1050 Seventeenth Street, N.W.
Suite 1100
Washington, D.C. 20036-5596
(202) 659-6500

*Attorneys for Plaintiffs Patriot-BSP City Center II,
LLC, Patriot-BSP City Center III, LLC, Patriot-BSP
City Center IV, LLC, Patriot Equities, LP, Erik E.
Kolar, Alan S. Werther, Michael C. Kolar, Timothy
E. McKenna and Geoffrey C. Gardner*

Dated: June 2, 2010


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Reply Memorandum in Further Support of Plaintiffs' Motion for Temporary Restraining Order was served via the court's electronic filing system this 2nd day of June, 2010 upon all parties of record:


/s/ Benny L. Kass
Benny L. Kass